Filed 6/18/18

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JEROME DION DAWKINS,<br><br>        Defendant and Appellant. | A150774<br><br>(San Mateo County<br>Super. Ct. Nos. SC084122A,<br>16-NF-002698-A) |

A jury convicted defendant Jerome Dion Dawkins of stalking, false imprisonment, criminal threats, lewd acts upon a child, and indecent exposure based on two incidents during which he harassed passengers on Bay Area Rapid Transit (BART) trains. After finding true various prior-conviction allegations, the trial court sentenced Dawkins to 25 years in prison.

On appeal, Dawkins claims that (1) venue for the indecent-exposure offense was not proper in San Mateo County because he committed the offense while the train was in Contra Costa County; (2) his constitutional rights were violated when the jury was inadvertently provided with a printout of his criminal history (rap sheet); and (3) the trial court abused its discretion by striking only three of the four prior convictions that were the subject of his motion under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*). In the published part of this opinion, we hold that venue was proper under the plain terms of Penal Code section 783, which pertains to offenses committed on various modes of transportation. We also reject Dawkins's remaining contentions and affirm.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.B. and II.C.

# I.
## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The May 5, 2015 Incident.*

Around 6:00 a.m. on May 5, 2015, a 15-year-old girl, whom we shall refer to as E., boarded a BART train at the San Bruno station to go to school. She intended to disembark at the Civic Center station in San Francisco, but got on the wrong train and ended up going in the opposite direction, toward San Francisco International Airport (SFO).

At the SFO station, E. stayed on the BART train as it reversed and began traveling toward San Francisco. She noticed a man in his 40's or 50's, whom she perceived to be homeless, lying on the seats across the aisle from her. They were the only people in the train car. The man, whom E. identified at trial as Dawkins, told her to look at him, but she did not comply. Then, reflected in the window, she saw Dawkins's hand moving up and down inside his pants. He repeatedly called at her, trying to get her attention, and she began crying.

Eventually, Dawkins tried to sit next to E., but her legs were blocking the area. He pushed her knee aside, sat down next to her, and said, " 'Look over here and stop crying.' " After he continued to move his hand inside his pants, E. switched seats, and Dawkins followed her and sat down in front of her. He then stuck out his leg to block her from moving again and said to her, " 'Shut up and stop crying like a little bitch.' "

As they approached the Daly City station, E. got up to exit the train, and Dawkins followed her. As she was standing near the doors, waiting for the train to pull into the station, he gripped her shoulder and said "to come with him" because "he was going to make [her] pregnant." E. then got off and boarded a more crowded train car, but Dawkins followed her. Raising his voice, he continued to tell her to "stop crying" and "acting like a little bitch."

Dawkins got off the train at the Glen Park station. As he exited, he told E. "he was going to mess [her] up and make [her] pregnant." She left the train at the 24th Street station, went to a relative's home, and reported the incident to the police.

A few days later, the police showed E. an array of six photographs, including one of Dawkins. She was not certain if the photograph of Dawkins was of the same person who had harassed her on the train, but she said that the man in the photograph had "sleepy" eyes similar to those of her harasser. She also said that a man in a different photograph had similar skin color and facial hair to that of her harasser, but she could not make a definitive identification.

At trial, however, E. testified that Dawkins, not the other man whose photograph she had also noticed in the array, was the man who had harassed her on the BART train. She indicated she now knew that Dawkins was the perpetrator because of his teeth. On the train, she had observed that the man's top row of teeth "was more likely missing" and his bottom teeth were yellow and rotten.

*B.      The May 6, 2015 Incident.*

Around 6:30 a.m. on May 6, 2015, the day after E. was victimized, a woman, whom we shall refer to as A., was with her one-year-old daughter. They boarded a BART train traveling toward Pittsburg-Bay Point at the Walnut Creek station, which is in Contra Costa County. The train car was "pretty empty," and a man whom A. identified as Dawkins was seated near her. Dawkins switched seats but then moved back to his original seat, reclining so that his feet were facing toward A. After the train left the Pleasant Hill station, A. noticed Dawkins was making "a vertical motion" near his stomach, and she realized that "he had his entire penis out of the fly of . . . [his] jeans" and was staring at her while he masturbated.

A. felt "stunned" and "immobilized," but after about a minute, she stood up and called out to other passengers, " 'He has his penis out. He's masturbating. He's looking at me and my baby.' " She then asked Dawkins what he was doing, and he got up and moved into another car.

3

A different passenger called the station agent through the onboard call box. When the train stopped at the Concord station, which is also in Contra Costa County, a BART police officer boarded and spoke to A. She described the man who had been masturbating. The officer then located Dawkins, whose fly was unbuttoned, and pulled him off the train.

### C. The Trial Court Proceedings.

The San Mateo District Attorney charged Dawkins with multiple crimes as a result of these incidents. Based on the incident involving E., Dawkins was charged with a felony count of stalking, a felony count of making criminal threats, two felony counts of lewd or lascivious acts upon a child, and one misdemeanor count of false imprisonment.[1] Based on the incident involving A., Dawkins was charged with a felony count of indecent exposure.[2] Dawkins was also alleged to have four prior strike convictions—one in 1987 for burglary, one in 1991 for robbery, and two in 1995 for rape—and to have served four prior prison terms, three for the strike convictions and one for an October 2013 indecent-exposure conviction.[3] At trial, the parties stipulated that, in addition to the October 2013 conviction, Dawkins had also been convicted of indecent exposure around April 2008 and around December 2008.

The jury found Dawkins guilty on all counts, and the trial court found true the prior-conviction allegations. The court then granted Dawkins's *Romero* motion in part, striking the burglary and robbery convictions and one of the rape convictions. Dawkins was sentenced as a second-strike offender to a total term of 25 years in prison, composed of a six-year term for the count of making criminal threats, three consecutive 16-month terms for the two counts of lewd acts and the count of indecent exposure, and three

---

[1] These charges were brought under Penal Code sections 646.9, subdivision (a) (stalking), 422, subdivision (a) (criminal threats), 288, subdivision (c)(1) (lewd acts), and 236 (false imprisonment). All further statutory references are to the Penal Code.

[2] This charge was brought under section 314, subdivision (1).

[3] The strike allegations were made under sections 667 and 1170.12, and the prior-prison-term allegations were made under section 667.5, subdivision (b).

consecutive five-year terms for the prior strikes. Terms for the remaining counts and enhancements were imposed and stayed, except that the prior-prison-term findings were also stricken.

II.

DISCUSSION

A.    *San Mateo County Was a Proper Venue in Which to Try the Indecent-exposure Charge.*

Dawkins claims that he could not be prosecuted in San Mateo County for the offense involving A. because it clearly occurred in Contra Costa County. We are not persuaded.

1.    Additional facts.

Dawkins brought a motion to dismiss the indecent-exposure count on the basis that venue was not proper in San Mateo County. At the preliminary hearing, the magistrate "reluctantly" denied the motion, stating that she did not "understand San Mateo County's interest in reaching into Contra Costa County and taking an offense that occurred entirely within their jurisdictional territory and prosecuting it here." She concluded, however, that venue was proper in San Mateo County under section 783 because the BART train had passed through the county on its route.

Dawkins later filed a motion under section 995 to dismiss the indecent-exposure count on the same ground, that venue was lacking, and the trial court denied it. He petitioned this court for a writ of prohibition, which we denied. Our state Supreme Court then denied his petition for review.

2.    Discussion.

Generally, under section 777, "the proper venue for the prosecution of a criminal offense is in the superior court of the county where the crime was committed." (*People v. Thomas* (2012) 53 Cal.4th 1276, 1281 (*Thomas*).) Venue " 'establishes the proper place for trial,' " but it does not affect a trial court's personal or subject matter jurisdiction over a criminal action. (*Id.* at p. 1282.)

5

"There are statutory exceptions to the general rule that a crime should be prosecuted in the county where it is committed" (*Thomas, supra*, 53 Cal.4th at p. 1283), including section 783, which is at issue here. Under that statute, when a crime is committed "on board . . . a railroad train or car . . . [or] common carrier transporting passengers," venue lies "in any competent court, through, on, or over the jurisdictional territory of which the . . . train . . . [or] common carrier . . . passes in the course of its voyage or trip, or in the jurisdictional territory of which the voyage or trip terminates." (§ 783; see also *Thomas*, at pp. 1281-1282.) "The words 'jurisdictional territory' . . . in [the] case of a superior court mean the county in which the court sits." (§ 691, subd. (b).)

In reviewing a ruling on a section 995 motion, we " ' "in effect disregard[] the ruling of the superior court and directly review[] the determination of the magistrate holding the defendant to answer." ' " (*People v. Superior Court (Bell)* (2002) 99 Cal.App.4th 1334, 1339.) "Venue is a question of law that is governed by statute." (*Thomas, supra*, 53 Cal.4th at p. 1282.) " ' "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose." ' " (*People v. Scott* (2014) 58 Cal.4th 1415, 1421.) We first consider the statutory language, " ' "giving [it] a plain and commonsense meaning." ' " (*Ibid.*) " ' " 'When [that] language . . . is clear, we need go no further.' [Citation.] But where a statute's terms are unclear or ambiguous, we may 'look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' " ' " (*Ibid.*) To the extent that Dawkins challenges the factual findings underlying the venue ruling, we uphold the ruling so long as there is " ' "some evidence" ' " to support it. (*Thomas*, at p. 1283.)

Here, the plain language of section 783 provides for venue in San Mateo County. At the preliminary hearing, two BART police officers testified that trains on the Pittsburg-Bay Point line generally originate in San Mateo County. Although the officers acknowledged the possibility that a train could be replaced somewhere along the line due

6

to a mechanical issue or some other problem, their testimony about the normal origin point of Pittsburg-Bay Point trains constituted sufficient evidence that the train on which Dawkins committed indecent exposure "passe[d]" "through, on, or over" San Mateo County "in the course of its voyage or trip."[4] (§ 783.) Thus, contrary to Dawkins's suggestion otherwise, there is no need to construe the statute's reference to trips "terminat[ing]" in a superior court's jurisdiction to include trips originating there. (*Ibid.*)

Dawkins claims that despite its unambiguous language, section 783 was intended to apply only when the particular location of a crime is unknown. He relies on *People v. Bradford* (1976) 17 Cal.3d 8 (*Bradford*), in which the defendant robbed a bank in Ventura County and a highway patrol officer stopped him in the same county for speeding. (*Id.* at p. 13.) The defendant shot at the officer and another person, and a chase ensued, ending in a traffic accident in neighboring Los Angeles County. (*Ibid.*) The defendant's accomplice then shot at two other officers. (*Ibid.*) After being convicted in separate trials in the two counties, the defendant appealed, claiming the proceedings had violated section 654's prohibition of multiple prosecutions. (*Bradford*, at p. 13.) The determinative issue was whether joinder of the charges was prohibited, and thus multiple prosecutions were permitted, because Los Angeles County was not an appropriate alternate venue for the Ventura County offenses. (*Id.* at p. 14.)

Framing the question as whether the Ventura County offenses could "be said to have occurred 'on a . . . motor vehicle' within the meaning of section 783," the Supreme Court agreed with the People that venue did not lie in Los Angeles County because "the offenses were committed *outside* the vehicle at an identifiable spot along the highway." (*Bradford, supra*, 17 Cal.3d at p. 15, italics added.) Construing section 783 "[i]n light of

---

[4] It is unclear from the record where Dawkins boarded the train. The BART police officer who interviewed him after his arrest testified that Dawkins "said he got on the BART train at the Millbrae BART station," took the train to the Pittsburg station, and "off-boarded the train because [Pittsburg is] the final destination, walked across the platform[,] and got on the [SFO]-bound train." But Dawkins exposed himself to A. on a train that was traveling toward Pittsburg, not San Francisco, so this explanation of how he traveled to the Concord station that day is inconsistent or at least incomplete.

the federal constitutional right to a trial by a jury drawn from the vicinage in which the crime occurred,"[5] the Court determined that "section 783 must be held inapplicable where, as here, the location of the crime is readily identifiable." (*Bradford*, at p. 17.)

Dawkins seizes on this broadly worded holding, contending that under *Bradford* section 783 does not apply because it is clear he committed indecent exposure somewhere in Contra Costa County. But in *Bradford* the offenses occurred outside the car, and thus section 783 did not apply by its terms. (*Bradford, supra*, 17 Cal.3d at p. 15.) In contrast, the offense here took place on a train that passed through San Mateo County on its trip. Although in *Bradford* the fact that the offenses occurred in a "readily identifiable" location also supported the result, the holding was consistent with section 783's language. (*Bradford*, at pp. 15, 17.) In other words, the Supreme Court did not have to interpret section 783 in a manner that contradicted its plain meaning, as Dawkins would have us do here.

We also disagree with Dawkins that interpreting section 783 to provide for venue in San Mateo County would violate his constitutional right to vicinage. As he acknowledges, subsequent cases cast doubt on *Bradford*'s reliance on the Sixth Amendment right to vicinage, which does not apply to the states through the Fourteenth Amendment. (See *Thomas, supra*, 53 Cal.4th at p. 1288; *Price v. Superior Court*, *supra*, 25 Cal.4th at p. 1065.) And while there is an implied right to vicinage under the state Constitution, it " 'constitutes simply the right of an accused to a trial by an impartial jury drawn from a place bearing some reasonable relationship to the crime in question.' " (*People v. Clark* (2016) 63 Cal.4th 522, 555.) Dawkins contends that the BART train's supposed departure from San Mateo County "sometime prior to the offense which was complete in Contra Costa" does not establish such a reasonable relationship, but he provides no authority for the contention. In light of section 783's express provision for venue in any county through which a train passes on its trip, there was a sufficient

---

[5] " '[V]enue and vicinage are logically distinct concepts. Venue refers to the location where the trial is held, whereas vicinage refers to the area from which the jury pool is drawn.' " (*Price v. Superior Court* (2001) 25 Cal.4th 1046, 1054.)

relationship between San Mateo County and the indecent-exposure offense such that Dawkins's right to vicinage was not violated. (See *People v. Chavarria* (2013) 213 Cal.App.4th 1364, 1369 [state constitutional right to vicinage "is effectively vindicated upon a showing of proper venue"].)

Dawkins claims that his position also finds support in the policy reasons for limiting venue that were articulated in *People v. Simon* (2001) 25 Cal.4th 1082 (*Simon*). Even if we could otherwise rely on policy justifications to interpret section 783 in a manner inconsistent with its text, those justifications do not support his claim.

"First, '[v]enue in the place where the crime was committed promotes the convenience of both parties in obtaining evidence and securing the presence of witnesses.' " (*Simon, supra*, 25 Cal.4th at p. 1095.) But Dawkins does not suggest how his ability to prepare his defense against the indecent-exposure charge was negatively affected by his being prosecuted in San Mateo County.

Second, venue in the place where the crime occurred " 'vindicate[s] the community's right to sit in judgment on crimes committed within its territory.' " (*Simon, supra*, 25 Cal.4th at p. 1095.) But Dawkins's only explanation for why this factor favors him is that "Contra Costa County declined to prosecute [the indecent-exposure] charge." There is no indication this is true except for Dawkins's counsel's assertion to that effect in the section 995 motion. And even if it is true, Contra Costa County's *lack* of interest in prosecuting the offense does not weigh against allowing San Mateo County to prosecute it.

Finally, venue in the place where the crime happened limits the prosecution's ability "to choose a setting that, for whatever reason, the prosecution views as favorable to its position or hostile or burdensome to the defendant's." (*Simon, supra*, 25 Cal.4th at p. 1095.) Again, Dawkins does not show how this factor supports his position. It may be that the San Mateo County District Attorney had an interest in prosecuting the indecent-exposure offense, for which Dawkins was immediately apprehended, in the same proceeding with the other offenses, as to which his identity as the perpetrator was at issue. But the policy reason for restricting the prosecution's ability to forum shop

involves the *venue's* favorability or hostility (see *ibid.*), and Dawkins does not identify anything about San Mateo County itself (such as the characteristics of its jury pool) that could or did negatively impact his defense. Moreover, though he opposed the People's motion to consolidate the indecent-exposure charge with the charges involving E., claiming that "the People [were] trying to bolster their weaker . . . case . . . with a stronger . . . case," on appeal he does not challenge the trial court's ruling that joinder was proper.

In short, neither the text of section 783, the right to vicinage, nor the policy reasons for limiting venue lead us to conclude that San Mateo County was an improper venue for bringing the indecent-exposure charge. As a result, Dawkins's claim fails.

B. *Dawkins Fails to Demonstrate any Prejudice Arising from the Jury's Inadvertent Access to a Copy of His Rap Sheet.*

Dawkins also contends that the trial court erred by denying his motion for a new trial after the jury was accidentally given his 20-page rap sheet. Although we recognize that it could easily be prejudicial for a jury to have improper access to a defendant's rap sheet during deliberations, Dawkins has failed to demonstrate any prejudice here.

1. Additional facts.

After the jury returned its verdict, the prosecutor discovered that Dawkins's rap sheet, which was used as an exhibit for the People's pretrial motion to admit Dawkins's prior convictions, had accidentally been provided to the jury with the other trial exhibits. The rap sheet revealed that Dawkins was a registered sex offender and had arrests and convictions dating back to the early 1980's for numerous crimes, including rape, sodomy, and other sexual offenses. His trial counsel conceded that there had been "no misconduct on the part of anybody in this matter" but argued that the rap sheet was "prejudicial on its face" and orally moved for a new trial. The trial court agreed with the prosecutor that it was appropriate to first question the jurors "to find out to what extent [they] reviewed [the rap sheet] and to what extent that affected their decision."

Upon being individually questioned, most of the jurors either denied reviewing the rap sheet or could not remember seeing it. Most of the jurors also agreed that the

topic of Dawkins's criminal history had been discussed, but none of them recalled that topic being discussed in reference to the rap sheet or any evidence other than that presented at trial (namely, the stipulation that Dawkins had three previous convictions for indecent exposure).

A hearing on the motion for a new trial was held several weeks later. The trial court denied the motion, explaining, "[I]t's pretty clear that the jurors did not consider the evidence that was sent back there inadvertently" and the few who had looked at it "didn't recognize what it was or realize it. It was never discussed among the jurors." As a result, the court found that Dawkins had failed to demonstrate the required prejudice.

2. Discussion.

A criminal defendant has a constitutional right to a trial by impartial and unbiased jurors. (U.S. Const., 6th and 14th Amends.; Cal Const., art. I, § 16; *In re Hitchings* (1993) 6 Cal.4th 97, 110.) A juror's "receipt of information about a party or the case that was not part of the evidence received at trial" undermines " 'the fundamental integrity of all that is embraced in the constitutional concept of trial by jury' " and is grounds for granting a new trial. (*People v. Nesler* (1997) 16 Cal.4th 561, 578-579; § 1181, subd. (2).)

When, as here, "extrinsic evidence . . . finds its way into the jury room through party or court error," we treat the problem as "ordinary trial error," not juror misconduct. (*People v. Gamache* (2010) 48 Cal.4th 347, 397-398.) Thus, the defendant has the burden of demonstrating prejudice. (*Id.* at p. 397.) We independently review the trial court's denial of a new trial motion based on the jury's receipt of outside information, but we " ' "accept the . . . court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." ' " (*Id.* at p. 396.)

Although Dawkins recognizes his burden to demonstrate prejudice, he contends that prejudice should be assessed under *Chapman v. California* (1967) 386 U.S. 18, 24, because his claim implicates his federal constitutional rights to due process and an impartial jury. Our state Supreme Court has explained, however, that when "a jury innocently considers evidence it was inadvertently given, . . . [t]he situation is the same

as any in which the [trial] court erroneously admits evidence. . . . Such error is reversible only if it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error" under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Cooper* (1991) 53 Cal.3d 771, 836; see also *People v. Gamache, supra*, 48 Cal.4th at p. 399.)

The trial court denied the motion for a new trial because it concluded that the jurors, most of whom had not even looked at the rap sheet, had not relied on it to reach the verdict. There was undoubtedly substantial evidence to support the court's determination. All of the jurors claimed either not to have reviewed the rap sheet or not to have looked at it closely, and they all denied that the exhibit had played a role in any discussion of Dawkins's criminal record. Based on its questioning of the jury, the court properly determined that a new trial was not warranted because the rap sheet had not affected the jury's deliberations.

In arguing otherwise, Dawkins contends that the testimony of Juror No. 11, who admitted to " 'thumb[ing] through' " the rap sheet but claimed not to have understood it, "is improbable and unworthy of belief." Dawkins points to the facts that (1) when shown the rap sheet, another juror quickly recognized that it involved Dawkins's criminal history, which Dawkins claims casts doubt on Juror No. 11's claim not to have understood the document; and (2) Juror No. 11 was the only one to deny that the jury had discussed Dawkins's criminal history, which Dawkins claims further undermines this juror's credibility. We agree with the Attorney General, however, that these inconsistencies do not provide a basis for disregarding Juror No. 11's testimony, much less "finding that the testimony affirmatively establishes something that [Juror No. 11] denied." Given the jurors' unanimous agreement that the rap sheet did not affect their deliberations, we cannot disturb the trial court's ruling that Dawkins failed to demonstrate prejudice.

Moreover, even if we were to assume that Juror No. 11 both reviewed and understood the rap sheet, we would conclude that it is not reasonably probable that Dawkins would have received a more favorable verdict in the absence of the extraneous

12

evidence. The jury was aware that Dawkins had three prior convictions for indecent exposure, and there was no real doubt that he committed the offense involving A. While E.'s initial identification was somewhat uncertain, by the time of trial she was sure that Dawkins was the perpetrator and specifically remembered his distinctive teeth. It was also suggestive that the offenses against her were committed the day before the offense involving A. Dawkins was not entitled to a new trial based on the jury's accidental receipt of his rap sheet.

### C. *The Trial Court Did Not Err by Partially Denying Dawkins's* Romero *Motion.*

Finally, Dawkins claims that the trial court abused its discretion by striking only three of the four prior convictions that his *Romero* motion covered. There was no error.

#### 1.      Additional facts.

After the trial court found true that Dawkins had four prior strike convictions—in 1987 for burglary, in 1991 for robbery, and in 1995 for two counts of rape, Dawkins asked the court to strike these convictions under *Romero*. Emphasizing that he otherwise faced life in prison, he urged the court "to strike at least one of his prior strikes." He argued that the convictions were remote and, although he had "exhibited a 'post-strike' record of drugs, indecent exposure, and other crimes, . . . nothing in the past 20 years involved physical assault or injury to another person." He also noted his difficult life circumstances, including his homelessness and "lifelong" addition to crack cocaine.

At the sentencing hearing, the trial court observed that "the bottom line issue, obviously, in this case, is whether the defendant should be sentenced as a three strikes case, which is an indeterminate sentence[,] or a two strikes case. [¶] The Court never really considered striking all the strikes and sentencing the defendant to a probationary sentence. I don't think that this case or his record warrants that in any way, shape, or form." Although "the recent offenses . . . [were] certainly extremely troubling," they were "at least not as serious as the previous convictions." Therefore, the court found it appropriate to strike the 1987 and 1991 convictions "due to [their] remoteness," as well

as one of the 1995 convictions, resulting in Dawkins's being sentenced as a second-strike offender.

A trial court may, "in furtherance of justice" (§ 1385, subd. (a)), dismiss a finding that a defendant has a previous strike conviction. (*People v. Carmony* (2004) 33 Cal.4th 367, 373; *Romero, supra*, 13 Cal.4th at pp. 529-530.) We review the denial of a *Romero* motion for an abuse of discretion. (*Carmony*, at p. 374.) The "Three Strikes" law, which is " 'intended to restrict courts' discretion in sentencing repeat offenders' . . . [¶] . . . [¶] . . . creates a strong presumption that any sentence that conforms to [its] sentencing norms is both rational and proper." (*Id.* at pp. 377-378.) As a result, "a trial court will only abuse its discretion in failing to strike a prior felony conviction . . . in limited circumstances," such as where it did not realize it had discretion to do so, where it "considered impermissible factors in declining to dismiss" the conviction, or where " 'the sentencing norms [of the Three Strikes law] . . . produce[] an "arbitrary, capricious[,] or patently absurd" result' under the specific facts of a particular case." (*Id.* at p. 378.)

Dawkins claims that "the trial court's reasons for striking one of the . . . rape convictions applied equally to the other rape charged in the same case, and . . . there was no rational reason to strike the one and not the other." He points to his description of the facts underlying the two convictions in his sentencing brief, in which he claimed he was convicted of raping a single victim, a friend who was also a "hopeless crack addict[]. She had promised him sex in exchange for drugs, but . . . once the drugs were used up, she declined to follow through." The trial court rejected this story as "very suspect and self-serving," however, and observed that in light of the lack of official information about the offenses it simply did not know "what the facts were." Dawkins identifies no authority suggesting that, to avoid an arbitrary result, a court must strike *all* similar convictions arising from an incident about which it has little information, and we decline to so hold.

Dawkins also argues that his life circumstances establish he is "outside the spirit of the Three Strikes law." It is hard to see what he has to complain about, however, since the trial court accepted the main point of his *Romero* motion and sentenced him as a two-strikes offender, allowing him to avoid a life term. In any event, his long criminal history

14

brought him well within the spirit of the statutory scheme (see *People v. Carmony, supra*, 33 Cal.4th at p. 378), and we cannot conclude that the trial court abused its discretion by striking some but not all of his prior convictions.

### III.
### DISPOSITION

The judgment is affirmed.

_____
Humes, P.J.

We concur:


_____
Margulies, J.


_____
Dondero, J.


A150774
*People v. Dawkins*

16

Trial Court:

Superior Court of the County of San Mateo (Redwood City)


Trial Judge:

Hon. Barbara J. Mallach


Counsel for Defendant and Appellant:

Kathy R. Moreno; by appointment under the First District Appellate Project


Counsel for Plaintiff and Respondent:

Xavier Becerra, Attorney General

Gerald A. Engler, Chief Assistant Attorney General

Jeffrey M. Laurence, Senior Assistant Attorney General

Catherine A. Rivlin, Supervising Deputy Attorney General

Allan Yannow, Deputy Attorney General

*People v. Dawkins*  A150774