Filed 11/26/25  In re Ryan K. CA4/1

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re Ryan K., a Person Coming Under the Juvenile Court Law. | |
| | D083728 |
| THE PEOPLE, | |
| Plaintiff and Respondent, | (Super. Ct. No. J244778) |
| v. | |
| RYAN K., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Rohanee Zapanta, Judge.  Affirmed as modified.

Susan S. Bauguess, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Ryan K. was alleged in a juvenile wardship petition to have committed five assaults and a murder based on his participation in a series of arbitrary, unprovoked, group attacks on unsuspecting victims. He contends (1) the evidence was insufficient to support the trial court's true finding he committed implied malice murder, (2) the prosecution failed to establish venue was proper in San Diego County, (3) the court erred when it committed him to a secure youth treatment facility (SYTF) instead of a less restrictive alternative, (4) the court erred when it set the baseline term of confinement to five years, and (5) the court erred when it set his maximum term of confinement to 25 years to life. We conclude Ryan's contentions lack merit with one exception: the court erred when it set the maximum term of confinement.

PROCEDURAL AND FACTUAL BACKGROUND

There were six attacks that led to the charges against Ryan. They took place on six separate days over the course of five months. Each incident was captured on video.

A.    *Attack on an Unidentified Bus Passenger*

On August 27, 2022, at about 7:00 p.m., Ryan and a group of companions spoke to an older man while they waited to board a bus. The group included two of Ryan's friends, Robert R. and Kamren P.

After boarding the bus, Ryan got out of his seat and struck the older man twice in the back of his head. The victim moved to a seat at the front of the bus. Ryan followed him and sat directly across from him. As the bus approached the next stop, Ryan appeared to give a signal to Robert and Kamren, who were still in the back of the bus. Robert and Kamren then ran to the front of the bus, and Robert slapped the victim's head. When the

2

victim stood up, Ryan and Robert began punching him. As the bus came to a stop, Robert and Kamren pushed and pulled the victim down the stairs headfirst to the sidewalk.

As the victim lay on the ground, *and as Ryan watched,* Robert stomped four times on the victim's head and spit on him. An unidentified person raised a large skateboard over his head and forcefully slammed it down, hitting the victim. Robert then took the skateboard from the unidentified person. Using two hands, he raised it high up over his head and swung it down hard. The skateboard slammed the victim on his upper back near his head. Ryan was standing right next to Robert when he did this. The victim was "knocked unconscious" and taken by ambulance to the hospital.

B.    *Attack on an Unidentified Man in Unknown Park*

On August 30, 2022, at approximately 12:37 a.m., a video on Ryan's cell phone records him attacking an unknown man. The video shows the man on the ground near a park bench as Ryan and another minor drag, kick, and beat him. The video shows Ryan kicking the victim's head at least four times as he begs him to stop, "Please! Please! Please! Please don't!" Law enforcement was unable to identify the person attacked, the location of the attack, the reason for the fight, or the identity of the other individual assisting Ryan with the beating.

C.    *Attack of Two Unidentified Persons at the Fashion Valley Trolley Platform*

On September 3, 2022, at about 8:00 p.m., Ryan participated in an attack of two unidentified men at the Fashion Valley Transit Center. Ryan was at the Transit Center with Robert and a group of other minors. Robert walked up to a man who was sleeping on a bench near the trolley tracks and punched or slapped him. After seeing this unprovoked attack, a second man

3

approached Robert and spoke to him. As they were speaking, Ryan started a fight by hitting the second man in the back of the head. Outnumbered, the second victim eventually ran away.

D. *Attack on a Trolley Passenger*

Another video on Ryan's cell phone records him attacking a San Diego trolley passenger after dark at an unknown time on November 2, 2022. The recording shows Kamren hanging from one of the upper handrails on the trolley while repeatedly striking a trolley passenger's head with his feet as the passenger tries to protect himself. The video then shows Ryan climbing into a seat next to the victim and punching him along with Kamren and a group of other individuals. The person holding the cell phone can be heard laughing and saying he has the victim's hat while encouraging the beating, with statements like, "Beat his ass! Yeah! Hey! Hey! Yeah! Beat his ass! Ooh-hoo-hoo." This fifth victim was also never identified.

E. *Attack of F.A. at the El Cajon Transit Center*

F.A., a San Diego deputy city attorney, was Ryan's next victim. On December 12, 2022, at about 6:00 p.m., F.A. encountered Ryan, Robert, and a group of about 8 or 9 other teenagers while taking the trolley home from work. They were all in the same trolley car. After F.A. got off at the El Cajon Transit Center, Robert started "spitting at [him] and smiling at [him] while staring at [him]." Robert advanced to "about 18 inches away from where [F.A. was] standing."

F.A. thought he was about to get hit. F.A. put his hands up defensively as he saw the other teenagers get off the trolley behind Robert. F.A. told the group, "Back up, back up, back up, back up, or I'll knock you out." When they continued to advance, he went into "panic mode" and punched one of them in the nose.

4

Robert responded by repeatedly punching F.A. The first punch was to F.A.'s left temple and it "knocked out [his] vision, so [he] couldn't see because [he is] predominantly left-eyed." Four of the other teenagers quickly joined in the fight. They punched F.A. with closed fists that "felt like punches that a teenager would throw, if they were throwing a punch as hard as possible." F.A. thought, "[I]f I fall, I'm going to die. If I stumble, they'll just start stomping on me."

F.A. grabbed one of the teenagers by his jacket collar, pulled him down to the pavement, and started dragging him toward a railing near the edge of the trolley platform. The group stopped the beating to pull the teenager away from F.A. and retreated to the trolley before it left the station. F.A. was "almost completely blind at this point."

F.A. estimated he was struck at least 30 times. He sustained a detached iris and lost his vision for 48 hours. He experienced severe pain in his ribs and has been diagnosed with post-concussion syndrome. He recalled Ryan hitting him and kicking him in his "right rib area."

F.      *Attack and Murder of Vinson Austin*

On January 10, 2023, at approximately 10:00 p.m., Ryan, Robert, Kamren, Kristopher W., and four of their female friends were at a bus stop in Lemon Grove. They tried to board a bus but got kicked off because some of them were "drunk" and others did not have bus fare. As the group headed to the trolley station, they crossed paths with Vinson Austin, 49 years old, and his friend. Robert started "cussing at them for no reason." The group followed the two men along the trolley tracks toward a nearby apartment complex.

After reaching a cul-de-sac, Robert, who had already tried to start another fight that night, asked the men where they were from and spit at

5

Austin.  Austin spit back, swung his fist at Robert, and the two "immediately" began fighting.  Ryan "jumped in on the fight" and began punching Austin, as did Kamren.  Austin fell to the ground.  Witnesses observed "a group of people kicking and punching and a man that was standing there," and then, "[a] whole bunch of juveniles . . . beating this man that was laying on the ground."

Austin managed to stand up and tried to get away.  But Ryan followed him, pushed him down again, and kicked him.  Then, as Ryan kicked him again, Austin managed to pull Ryan to the ground and get on top of him.  When this happened, Robert and Kamren ran toward Ryan and Austin.

Kamren then repeatedly punched Austin in the head.  Robert stabbed him twice in his upper body with a knife.  Kamren and Robert then stepped back and each took a turn running toward Austin and kicking him in the head.  The attack continued until Austin's friend, James, pulled Austin away from Ryan and defended him by trying to hit Kamren with a small boombox he had been carrying.

Austin fell to the pavement and lay in a pool of blood.  Everyone else scattered.  When Lemon Grove Sheriff's deputies arrived, Austin was in pain and a "stream of blood" from his body was "flowing down the gutter."  One of the deputies applied a tourniquet to a stab wound to his upper right thigh, but he died shortly after arriving at the hospital.  He had been stabbed five times—in his hip, torso, forearm, left leg, and right thigh—and he died from those wounds.  His upper torso, head, hands, and forearms were covered with blunt-force injuries.

Kamren was arrested near the apartment complex trying to jump over a fence to the trolley line.  He had a black and orange folding knife with an

6

eight centimeter blade in his pocket.  It was a hunting knife with a gut hook at the end of it.  The knife tested negative for Austin's DNA.

Deputies found Ryan and Robert at the Lemon Grove trolley station platform.  Ryan had blood on his pants, two cuts on his left hand, a cut on his upper lip, and appeared to be walking with a limp.  Robert had a circular wound on his right hand that "had an open flap that appeared to be fresh and was bleeding."  DNA testing showed that 99 percent of the blood on Ryan's jacket was $1.5 \times 10^{32}$ times more likely to have originated from Austin than an unknown person.  DNA testing also provided strong support that Austin contributed to the mixture of blood found on Robert's clothing.

G.    *Trial Court Proceedings*

In September 2023, the San Diego County District Attorney filed a sixth amended juvenile wardship petition alleging Ryan committed six felonies:  one count of murder (Pen. Code, § 187, subd. (a)) and five counts of assault by means of force likely to produce great bodily injury (*id.,* § 245, subd. (a)(4)).  Following an adjudication hearing in September 2023, the juvenile court found the murder allegation true beyond a reasonable doubt on a theory of aiding and abetting an implied malice murder.  The court also found true all five allegations of assault by means of force likely to produce great bodily injury.

After a contested disposition hearing, the juvenile court ordered Ryan to remain a ward of the court and placed him in a SYTF for a five-year baseline term and a maximum term of confinement of 25 years to life for the murder count, plus a determinate term of seven years for the remaining five counts.

7

# DISCUSSION

## I.

### *Substantial Evidence Supports the Second Degree Murder True Finding*

Ryan contends there is insufficient evidence to support the trial court's true finding he committed implied malice murder. He contends the scienter element of aiding and abetting an implied malice murder was unsatisfied because "the prosecution presented no evidence [he] was aware Robert was armed with a knife" the night Austin was killed. Ryan asserts that "[w]hile [he] had been engaged in incidents with Robert, and others, in the past, none of those incidents involved the use of a knife, *or any other deadly weapon.* They consisted of punches and kicks, after which all the minors fled." (Italics added.) He further asserts "[t]he incidents in the past never went [so] far [as] to culminate in death since the minors never appeared to be armed with deadly weapons during those past events. Therefore, there would be no reason for [him] to assume otherwise that evening." We disagree.

Our review is for substantial evidence. (*In re V.V.* (2011) 51 Cal.4th 1020, 1026.) "In reviewing the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Our role on appeal is a limited one. Under the substantial evidence rule, we must presume in support of the judgment the existence of every fact that the trier of fact could reasonably have deduced from the evidence. Thus, if the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment. (*Ibid.*, italics omitted [cleaned up].)

8

We begin with the elements of implied malice murder.  Murder is committed with implied malice when "the killing is proximately caused by an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.  To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical." (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*) [cleaned up].)  To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must "involve a high degree of probability that it will result in death." (*Id.* at p. 989 [cleaned up].)

We turn next to the elements required to establish an implied malice murder on an aiding and abetting theory.  "Direct aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea.  In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act.  For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act.  Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act.  The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life." (*Reyes*, *supra*, 14 Cal.5th at pp. 990–991 [cleaned up].)  " '[A] finding of implied malice depends upon a determination that the defendant actually

9

appreciated the risk involved, i.e., a subjective standard.' " (*People v. Superior Court* (*Valenzuela*) (2021) 73 Cal.App.5th 485, 502 (*Valenzuela*), italics omitted.)

Here, there was sufficient evidence for a reasonable factfinder to conclude Ryan had the mens rea required to support implied malice murder on an aiding and abetting theory based on (1) his act of aiding and abetting Robert in a life-threatening group attack on Austin, and (2) substantial evidence he knew and shared Robert's specific intent to engage in a beating during the attack that posed a high probability of death.

Starting with the life-endangering act, Ryan ignores the People's actual theory for culpability. He focuses in isolation on Robert's act of stabbing Austin. He argues, "there was no evidence [Ryan] knew Robert had a knife that evening and intended to use it." As a consequence, he argues, "there was never a showing that [Ryan] knew his conduct that night endangered the life of [Austin] and that he acted with conscious disregard for life." Ryan misses the mark with his focus on whether the evidence demonstrated he knew Robert was carrying a knife.

The People here founded their theory for implied malice murder on Ryan's act of participating in the group attack when he knew "how dangerous his friends [were]," not the more specific act of stabbing Austin. The People's theory was a valid one. (See *Valenzuela, supra,* 73 Cal.App.5th at p. 503 [concluding culpability for aiding and abetting an implied malice murder may exist when a "confrontation was not merely a challenge to fisticuffs, but rather a show of force and threat of deadly force"]; *People v. Didyavong* (2023) 90 Cal.App.5th 85, 99 ["Although the cause of death was gunshot wounds, [the defendant] aided the commission of the life-endangering act of the violent life-threatening [group] retaliation"].) The evidence here that Ryan

10

participated in the vicious group beating is virtually indisputable. Surveillance video from a nearby apartment complex captured him pushing, punching, and kicking Austin during the beatdown.

Turning to the mens rea element, the evidence Ryan participated in the beating with the requisite mental state of implied malice is more than adequate to support the trial court's true finding. Ryan took part in at least two prior life-threatening group attacks with Robert and Kamren before the attack on Austin. MTS video surveillance camaras recorded him attacking a bus passenger with Robert, Kamren, and a group of unidentified minors. The video shows Ryan signaling to Robert and Kamren right before he personally instigated the beating. After Robert and Kamren drag the victim to the sidewalk and incapacitate him, the video shows Ryan watching as Robert stomps four times on the victim's head and an unidentified person forcefully slams a large skateboard on or near his head. The video then captures Ryan standing right next to Robert as Robert slams the prone and motionless victim with the skateboard again.[1] Beating a victim senseless to the point of unconsciousness and then hitting him on or near his head with a large skateboard undoubtedly presents a high probability of death.

Based on this prior incident alone, the trial court could reasonably infer Ryan intended the group attack on Austin to be far more than a "simple fistfight," and that he and Robert harbored the shared intent to engage in a life-endangering beating. (*People v. Cravens* (2012) 53 Cal.4th 500, 511.) But there's more. On December 12, 2022, Robert and Ryan and a group of other

---

[1] Ryan's contention that "the minors never appeared to be armed with deadly weapons during . . . past events" is belied by this recorded evidence. His contention, accordingly, is not well taken.

11

teenagers attacked F.A. and punched him in the head with closed fists to the point where he thought he would be killed if he fell down. In the victim's words, "[I]f I fall, I'm going to die." Although F.A. managed to stay upright and fight off his attackers, the beating was so severe his iris detached, he was blind for 48 hours, and he suffered a concussion.

Ryan's active participation during Austin's beating provides further evidence he harbored implied malice. He personally battered Austin with his friends after Austin fell down for the first time. Then, when Austin managed to crawl away and stand up, Ryan followed him, pushed him down again, and repeatedly kicked him until Austin briefly turned the tables and pulled Ryan to the ground as well.

From this evidence, the trial court could readily infer Ryan subjectively appreciated and consciously disregarded the high probability of death posed by his act of participating in a group attack with Robert and Kamren. Substantial evidence therefore supports the court's conclusion he had the required mental state to support a true finding he aided and abetted the implied malice murder of Austin.

## II.

### *Ryan's Challenge to Venue Is Forfeited*

For the first time on appeal, Ryan challenges venue with respect to count 3, the attack on an unidentified man that was recorded on his cell phone on August 30, 2022. Ryan did not object to venue before trial; his argument on appeal is therefore forfeited.

After the close of evidence, Ryan made a brief, oral motion to dismiss count 3 on the ground the court lacked *territorial subject matter jurisdiction* because there was insufficient evidence to prove the offense took place in California. His defense counsel asserted, "There's no evidence before the

12

[c]ourt that this incident occurred in the state of California, so I'm asking the Court to dismiss [c]ount 3 based on the lack of evidence that this incident occurred in California." The trial court sustained a true finding on count 3 without directly addressing Ryan's motion, thereby implicitly denying it. Ryan did not object or otherwise claim *venue* in San Diego was improper.

To preserve an objection to venue, the defendant is required to raise the issue before trial. (*People v. Simon* (2001) 25 Cal.4th 1082, 1103 (*Simon*).) In general, " 'the proper venue for the prosecution of a criminal offense is in the superior court of the county where the crime was committed.' " (*People v. Dawkins* (2018) 24 Cal.App.5th 698, 704; Pen. Code, § 777.) The question of venue, however, constitutes "a nonfundamental aspect of jurisdiction which may be waived either by [a] defendant's consent or by failure to object." (*People v. Gbadebo-Soda* (1995) 38 Cal.App.4th 160, 170.) As explained by our high court, "the question of venue does not involve a matter of a court's fundamental authority or subject matter jurisdiction over a proceeding. Instead, the right to be tried in a statutorily designated venue is intended, from the perspective of an accused, as a safeguard against being required to stand trial in an unrelated and potentially burdensome distant location. This protection can be meaningfully afforded to a defendant only if he or she objects to venue *before* being required to proceed to trial in the allegedly improper locale." (*Simon*, at p. 1103.) Therefore, "taking into account the nature and purpose of the venue safeguard and the substantial state interest in protecting the integrity of the process from improper 'sandbagging,' . . . a defendant who fails to raise a timely objection to venue in a felony proceeding forfeits the right to object to venue—either at trial or on appeal." (*Id.* at p. 1104.)

Ryan does not dispute he failed to object before trial to San Diego as a venue for adjudicating count 3. He did not respond in his reply brief to the Attorney General's contention he forfeited his challenge to venue on appeal. His objection is accordingly forfeited as a matter of settled law.

In an abundance of caution, we consider sua sponte whether the evidence was sufficient under a preponderance of the evidence standard to support a finding that count 3 took place in California. We do so because this question implicates our fundamental subject matter jurisdiction. (See generally, *People v. Betts* (2005) 34 Cal.4th 1039; *People v. Joseph* (2021) 63 Cal.App.5th 1058, 1068–1072.) We conclude there is sufficient evidence in the record to conclude Ryan committed the count 3 assault in California.

Ryan was 14 years old when the six charged offenses took place. He was in San Diego on August 27, 2022 when he committed the first charged assault on the unidentified bus passenger. Three days later, on August 30, 2022, he committed the count 3 assault. Four days after that, on September 3, 2022, he committed another assault in San Diego.

On these facts, it is reasonable to infer Ryan did not travel to a public transit system somewhere outside of California to commit the count 3 assault. Commission of the offense in Arizona or Nevada, for example, would require at least six to eight hours travel by car or plane there and at least another six to eight hours travel back to San Diego. Given that Ryan was 14 years old and not a legally licensed driver—and given that the three assaults occurred within the space of a week—these logistics are more than adequate to establish by a preponderance of the evidence that Ryan committed the August 30 assault in California. The trial court's true finding on count 3 is accordingly affirmed.

14

III.

*No Error Committing Ryan to a Secure Youth Treatment Facility*

Ryan contends the trial court abused its discretion when it committed him to a SYTF instead of a less restrictive alternative, the Healing Opportunities for Personal Empowerment (HOPE 480) program.  His specific claim, as we understand it, is founded on the principle that a court abuses its discretion when factual findings critical to its decision find no support in the record.  (*In re Nicole H.* (2016) 244 Cal.App.4th 1150, 1154.)  He contends the People's evidence was too generic to allow the court to fairly assess whether the programming, treatment, and education offered and provided at the Secure Track Youth Facility Youth Development Academy (YDA) would be appropriate to meet his treatment needs.  Because the court was required to take Ryan's treatment needs into consideration when selecting an appropriate program, he seeks a remand for more evidence to be adduced on this point so the court can appropriately weigh this consideration when deciding whether commitment to YDA was warranted.  We are not persuaded.

Welfare and Institutions Code[2] section 875, subdivision (a), authorizes trial courts to commit a ward who is 14 years of age or older to a SYTF if certain criteria are satisfied.  The criteria are as follows:  (1) "The juvenile is adjudicated and found to be a ward of the court based on an offense listed in subdivision (b) of [s]ection 707 that was committed when the juvenile was 14 years of age or older," (2) "[t]he adjudication . . . is the most recent offense for which the juvenile has been adjudicated," and (3) "[t]he court has made a

---

[2]    Undesignated statutory references are to the Welfare and Institutions Code.

15

finding on the record that a less restrictive, alternative disposition for the ward is unsuitable."  (§ 875, subd. (a)(1)–(3).)

When assessing potential less restrictive means, the trial court must "consider all relevant and material evidence, including the recommendations of counsel, the probation department, and any other agency or individual designated by the court to advise on the appropriate disposition of the case." (§ 875, subd. (a)(3).)  In addition, the court is required to base its decision on five criteria:  (1) "The severity of the offense or offenses for which the ward has been most recently adjudicated, including the ward's role in the offense, the ward's behavior, and harm done to victims," (2) "[t]he ward's previous delinquent history, including the adequacy and success of previous attempts by the juvenile court to rehabilitate the ward," (3) *"[w]hether the programming, treatment, and education offered and provided in a [SYTF] is appropriate to meet the treatment and security needs of the ward,"* (4) "[w]hether the goals of rehabilitation and community safety can be met by assigning the ward to an alternative, less restrictive disposition that is available to the court," and (5) "[t]he ward's age, developmental maturity, mental and emotional health, sexual orientation, gender identity and expression, and any disabilities or special needs affecting the safety or suitability of committing the ward to a term of confinement in a [SYTF]." (§ 875, subd. (a)(3)(A)–(E), italics added.)

Ryan's focus here is on the third criterium and the general requirement, set forth in section 875, subdivision (a)(3), that the trial court must make a "finding on the record that a less restrictive, alternative disposition for the ward is unsuitable" before committing a minor to a SYTF. He does not challenge the court's findings with respect to the other criteria, such as the severity of the offense and community safety, so we do not discuss

16

in detail the evidence supporting the trial court's findings with respect to those criteria. Ryan specifically contends "[b]ecause the record does not contain sufficient evidence of [his] needs or the programs and services at the SYTF that may benefit him and serve those needs, it is impossible . . . to assess whether the juvenile court properly exercised its discretion." Ryan's contention that the record is underdeveloped on this point lacks merit.

Starting with evidence of Ryan's treatment and security needs, the record before the trial court includes a confidential psychological evaluation report prepared by a clinical psychologist. The psychologist tested and interviewed Ryan after reviewing key documents in his criminal case file. In the psychologist's opinion, Ryan exhibited no barrier to understanding social rules and demands. His disregard of such conventions was "connected with a disorder of attention," and "very likely compounded by the negative influence of his peers and his use of drugs." In the psychologist's view, Ryan also likely experienced trauma and emotional distress in response to the crime. The interventions and treatment services recommended by the psychologist included (1) "intervention for his drug and alcohol abuse," (2) "the close monitoring of his associations," and (3) an evaluation to determine whether "psychopharmacological intervention" is needed to address his impulsive behavior and apparent attention disorder.

The record before the trial court also included a probation social study report prepared by Ryan's probation officer. The probation officer agreed with the psychologist's recommendations and further identified two treatment "[g]oals" based on Ryan's "primary needs." (Capitalization and boldface omitted.) Those goals were the development of "enhanced decision-making skills," and the "develop[ment] [of] pro-social peer relationships." (Capitalization and boldface omitted.)

17

The appropriateness of a YDA commitment and unsuitability of less restrictive options were also squarely addressed by evidence adduced at the disposition hearing. Ryan's probation officer and the supervising probation officer in charge of YDA recommended commitment to YDA instead of HOPE 480 for several reasons relating to Ryan's treatment and security needs.

The YDA supervisor personally reviewed Ryan's file and opined that "[his] reports are in line with the individuals that we house and are in line with the programming that we offer for rehabilitative services." Among other programs, YDA offers "Trauma Focused Cognitive Behavior Therapy," "Dialectical Behavior Therapy," behavior health education, and substance abuse disorder education. For individuals like Ryan, the YDA supervisor explained "the benefits are the structure and the programming that is available." In his view, the programming "is primarily trauma focused and culturally responsive care" and would be of "substantial benefit" to Ryan if he bought in to the program. In addition, at YDA, a multi-disciplinary team, which may include attorneys, "parents, support services, [and] community supervision officers," ensures minors "are able to receive really individualized programming opportunities." The probation officer also believed YDA would be "very beneficial" to Ryan.

By contrast, the probation officer and YDA supervisor explained that commitment to the HOPE 480 program is limited to a maximum of 480 days. This timeframe, in their view, was inadequate because Ryan needed "extensive programming and rehabilitation in order to modify his behavior." They acknowledged that there is overlap in the programs available at YDA and those available at the HOPE 480 program. But, they explained, if Ryan was committed to the HOPE 480 program, the 480-day limitation would mean he could only complete one, two, or possibly three programs while

18

there. By contrast, if committed to YDA, he could complete "a good percentage" of the programs and potentially even all of them within four years.

The foundation created by this evidence was more than adequate for the trial court to comply with its statutory obligation to "consider," as required by section 875, subdivision (a)(3)(C), "[w]hether the programming, treatment, and education offered and provided in a [SYTF was] appropriate to meet [Ryan's] treatment and security needs," and whether "a less restrictive, alternative disposition for [him was] unsuitable." The court's ruling indicates it did exactly this. After reviewing the relevant documents and considering the testimony of both witnesses, the trial court concluded commitment to YDA was most strongly warranted based on "the multiple true findings of Ryan committing separate, random acts of violence upon different random victims, who had . . . no prior association with the youth." The court further found "[t]he Instant Offense was exceedingly serious, displays a threat to the community and the youth himself, and as a result, he is in need of the structure and services that . . . SYTF . . . can provide." In addition, and precisely relevant to the challenged criterium here, the court concluded Ryan was "not amenable to a HOPE 480 commit [because] [h]is needs are best addressed in a highly controlled environment [with] structured programming [he] can rely on for stability and predictability for an extended period of time."

Ryan points to no authority that required the trial court to discuss its reasoning in more detail. The court, accordingly, did not abuse its discretion when it committed Ryan to a SYTF.

19

*No Error Setting the Baseline Term to Five Years*

Ryan contends the trial court abused its discretion when it set his baseline term of confinement to YDA to five years. Focusing on a single consideration, he contends the five-year commitment falls " 'outside the bounds of reason' under applicable law and relevant facts" because the supervising probation officer for YDA testified that it was *possible* to complete all of the rehabilitative programs at YDA in four years. We are again not persuaded. The record amply supports a finding that Ryan will need more than four years to complete the rehabilitative programs available to him at YDA, and other considerations, in addition to the time needed for his potential rehabilitation, warranted imposition of a five-year baseline term.[3]

"The abuse of discretion standard of review asks in substance whether the ruling in question falls outside the bounds of reason under the applicable law and the relevant facts. We indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them." (*In re Tony R.* (2023) 98 Cal.App.5th 395, 414 [cleaned up].)

Here, the trial court was required to set Ryan's baseline term using the "offense-based classification matrix" set forth in rule 5.806(d). The matrix

---

[3] Pursuant to California Rules of Court, rule 5.806(b), the trial court was required to "state on the record its reasons for selecting a particular [baseline] term, referencing each of the criteria and any factors the court deemed relevant." We do not consider whether the court complied with this directive because Ryan does not assert the court erred in this regard. Further undesignated rules references are to the California Rules of Court.

authorizes a baseline term of four to seven years.  (*Ibid.*)  The term must be selected based on four criteria:  (1) "[t]he severity and statutory degree of the offense for which the youth has been committed to the [SYTF]," (2) "[t]he youth's prior history in the juvenile justice system," (3) "[t]he confinement time considered reasonable and necessary to achieve the rehabilitation of the youth," and (4) "[t]he youth's developmental history."  (Rule 5.806(b).)  "The court must select a baseline term that is no longer than necessary to meet the developmental needs of the youth and to prepare the youth for discharge to a period of probation supervision in the community."  (*Ibid.*)

Applying these criteria, the trial court reasonably found that the multiple true findings that Ryan committed random assaults on random victims culminating in the murder of Austin presented a strong argument for a SYFT commitment with a baseline of seven years.  The court found further support for an extended commitment based on Ryan's failure to follow directions and involvement in numerous assaults while detained at juvenile hall pending the disposition hearing.  Based on these considerations, the court reasonably found he needed "structured programming . . . for an extended period of time."

Nevertheless, taking into account Ryan's honesty in conveying his history to the psychologist and his probation officer, and the psychologist's assessment that he has the "ability to understand and cognitively process information," the trial court imposed a baseline term of five years instead of the seven years sought by the prosecutor.  We find no irrationality in this determination nor lack of evidence to support it.  Although a minor could "[p]otentially" complete all available programs in four years, Ryan's probation officer estimated in general that minors can only complete "a good percentage" of the programs in a four to seven year timeframe.  The officer

21

further opined that Ryan needed "extensive programming and rehabilitation in order to modify his behavior." In addition, as recounted, the court reasonably determined the other criteria in rule 5.806 weighed in favor of a longer, seven-year baseline term. On these facts, the court's selection of a baseline term of five years instead of four years was not an abuse of discretion.

## V.

### *Correction to the Maximum Term of Confinement*

The parties agree the trial court erred when setting Ryan's maximum term of confinement at 25 years to life for the murder count, plus a determinate term of seven years for the remaining five counts. We agree as well. When a court removes a minor from the physical custody of his parent or guardian, the court must set a maximum term of confinement equal to "the middle term of imprisonment which could be imposed upon an adult convicted of the offense or offenses which brought or continued the minor under the jurisdiction of the juvenile court." (Welf. & Inst. Code, §§ 726, subd. (d)(1) & (2), 875, subd. (c)(1)(B).) The term of imprisonment for second degree murder is 15 years to life, not 25 years to life. (Pen. Code, § 190, subd. (a).)

## DISPOSITION

The disposition order is modified to state that Ryan's maximum term of confinement is 15 years to life, plus a determinate term of seven years. As modified, the judgment is affirmed.


DO, J.

WE CONCUR:


IRION, Acting P. J.


DATO, J.